In re CANADIAN GULF LINE, Limited.

CANADIAN GULF LINE, Limited, v. CONTINENTAL GRAIN CO.

No. 360.

Circuit Court of Appeals, Second Circuit.
July 29, 1938.

Haight, Griffin, Deming & Gardner, of New York City (Wharton Poor and Herbert M. Statt, both of New York City, of counsel), for appellant.

Bigham, Englar, Jones & Houston, of New York City (F. Herbert Prem, of New York City, of counsel), for appellee.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The question on this appeal is whether or not petitioner Canadian Gulf Line, Ltd., sub-charterer of the motorship "Soloy", is entitled to an order directing the respondent Continental Grain Co., chartered owner of the vessel, to arbitrate certain disputes between the parties in accordance with the provisions of the charterparty. The Canadian Gulf Line, Ltd., will hereafter be called "charterer" and The Continental Grain Co. "owner".

Under the original charterparty dated January 21, 1937, the charterer hired the motor "Dagrun" from the owner for six months but later paid $2,000 to have the motor "Soloy" substituted, believing that she would be available for the charterer's business earlier than the other vessel. The terms of the original charterparty under an "Addendum" thereto were to apply to the "Soloy". The bonus of $2,000 is alleged to have been paid upon the owner's representation that she would be available earlier than the "Dagrun" to take on newsprint paper at Powell River, British Columbia, whence the charterer by contract with the shipper was to transport the paper to Texas where it was to be delivered to newspaper publishers for use in their presses. The agreements between the parties to the charter nowhere contained any provision that the "Soloy" was to be engaged in any particular trade or contained any reference to the payment of $2,000 as a consideration for obtaining an earlier vessel than the "Dagrun".

The "Addendum" to the charter dated March 19, 1937, provided for substitution of the "Soloy" and concluded thus:

"Rate of hire and all other terms and conditions and exceptions of the said charter party remaining in full force and effect without alteration."

Clause 17 of the original charter reads as follows:

"That should any dispute arise between the Owners and the Charterers, the matter in dispute shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for enforcing any award this agreement may be a rule of the Court."

Disputes having thereafter arisen between the parties, they entered into a written agreement in consideration of each refraining from demanding immediate arbitration pursuant to Clause 17, supra. The agreement referred to the charter dated January 21, 1937, and Clause 4 of that agreement provided: "that if the claims heretofore asserted by Canadian-Gulf Lines, Ltd., against Continental Grain Company under the above dated Charter Party and Addendum are not settled and compromised between the two said parties, on or before December 1, 1937, then and in such event either of the said parties may immediately demand arbitration of the same matters without further notice to the other, and that the matters in dispute between the said parties shall thereafter proceed to arbitration as promptly as circumstances permit."

The charterer demanded arbitration of its claims against the owner in respect to the following matters:

(1) Damages arising from a sale by the owner to the charterer of bad Diesel oil.

(2) Loss of ten days' hire.

(3) Damages in the amount of $9,060 for excess cost of rail transportation over water carriage of the newsprint paper from Powell River in British Columbia to Texas.

because of delay caused by unseaworthiness of the "Soloy's" engines or by bad oil or both.

(4) Refund of the $2,000 paid for substitution of the "Soloy" for the "Dagrun" because of the alleged representation.

Dispute (1) arises under a clause of the charterparty which provides: "3. That the Charterers shall accept and pay for all coal in the Steamer's Bunkers, and the Owners shall, on expiration of this Charter Party, pay for all Coal left in the Bunkers * * *".

The "Soloy" was to be delivered to the charterer at Rotterdam, which port according to the "Addendum" she was expected to reach about March 21–25, 1937. When she arrived there her bunkers contained only about 15 tons of fuel oil. The charterer was notified of this by the owner and agreed to purchase Diesel oil from the latter in order to supply the ship. The charterer paid $5,000 for the oil after it was loaded. The "Soloy" was then delivered at Rotterdam and left for Vancouver on April 20. The charterer claims that because the Diesel oil which had been purchased was bad the vessel was forced to put in at Falmouth where she discharged the oil, redelivered it to the owner and took on 220 tons of new fuel at a cost of $2,200. The charterer demands the difference between the $5,000 paid for the bad oil and the $2,200 paid for the new fuel, or $2,800.

Dispute (2) is over the claim of the charterer for loss of ten days' hire because of the bad oil furnished by the latter and the unseaworthy condition of the "Soloy's" engines.

Dispute (3) is over the claim that because of bad oil and the alleged unseaworthy condition of her engines the "Soloy" failed to leave Falmouth early enough to get to Powell River in British Columbia in time and the charterer was therefore obliged to ship 6,040 tons of paper by rail at $9,060 more than it would have cost to carry it by the "Soloy".

Dispute (4) is over the charterer's alleged right to obtain restitution of the $2,-000 paid by it to have the "Soloy" substituted for the "Dagrun". The claim is based upon the alleged representation by the owner as to the availability of the "Soloy" as against the "Dagrun".

The owner denies any obligation to proceed to arbitration and also controverts each claim on the merits.

Upon a motion by the charterer that the owner proceed to arbitration of the claims, Judge Goddard made an order to that effect from which the owner has appealed. We have held a similar order to be "the last deliberative action of the court" and final for the purposes of an appeal. Krauss Bros. Lumber Co. v. Louis Bossert & Sons, 2 Cir., 62 F.2d 1004, 1005; In re Utility Oil Corporation, 2 Cir., 69 F.2d 524, 526. Accordingly the appeal properly lies.

It is argued that Clause 17 of the charterparty only provides for arbitration of disputes arising out of breaches of the charterparty. If it be held to be thus limited, it is further argued that the claims asserted here do not arise out of such breaches.

█ There certainly is ground for supposing that dispute (1) involving the right to recover for loss on the bad oil furnished by the owner to the charterer arose from the alleged breach of a collateral agreement. The charterparty itself only required the charterer to accept and pay for fuel "in the Steamer's Bunkers". Any other fuel it was itself obliged to furnish under Clause 2 of the charter providing that "the Charterers shall provide and pay for all the Coals except as otherwise agreed * * *". Coal is defined in Clause 30 of the charter as including oil. When the charterer ordered oil from the owner it simply made the latter its agent and consequently any liability for loss in respect to bad oil arose out of that particular contract of sale and not out of the charterparty proper. The only possibility of construing the oil contract differently is by treating the oil furnished upon the charterer's request after the arrival of the vessel at Rotterdam as oil "in the Steamer's Bunkers" within Clause 3 of the charter, because it had been loaded, though at charterer's instance, before the vessel was delivered.

█ Dispute (2) relating to loss of ten days' hire while the vessel was laid up at Falmouth, so far as it may be attributed to unseaworthy condition of the "Soloy's" engines, certainly involved an alleged breach of the warranty of seaworthiness in the charterparty and was a subject of arbitration in any view. So far as the loss was due to bad oil, it would come within the principles we have discussed in connection with dispute (1).

Dispute (3) relating to additional expenses due to shipment of press paper by

rail caused by delay attributable to bad oil and unseaworthiness would come under the same principles discussed under dispute (2).

Dispute (4) relates to a cause of action to obtain restitution of the $2,000 paid for the substitution of the "Soloy" for the "Dagrun". The charterer's claim is based upon an alleged collateral representation as to the availability of the "Soloy" to reach Powell River earlier than the "Dagrun", and not upon any breach of a covenant in the charterparty. Its theory seems to be that the $2,000 may be allowed by arbitrators because the owner paid that additional sum to secure the "Soloy", which failed to reach Powell River at the time represented, through unseaworthiness or bad oil chargeable to the fault of the owner.

None of the items except claims for losses from unseaworthiness and losses arising from bad oil, based on the theory that the oil placed in the bunkers at Rotterdam was oil "in the Steamer's Bunkers" within Clause 3 of the charterparty, could be founded upon any breach of the latter instrument. But though the claims are not strictly for breaches of the charterparty itself, we think they come within the broad terms of the clause which subjects to arbitration "any dispute * * * between the Owners and the Charterers * * *". We can have little doubt that the parties had in mind and expressed by the words "should any dispute arise" in Clause 17 an intention to submit to arbitration; rather than to judicial decision, any disputes arising out of the maritime venture initiated by the charterparty. The Act of Congress of February 12, 1925, c. 213, Sec. 2, 43 Stat. 883, 9 U.S.C.A. § 2, provides that: "A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." The disputes here arose out of a "maritime transaction" and there was an agreement stated in the broadest terms to submit such disputes to arbitration.

Arbitration sometimes involves perils that even surpass the "perils of the seas".

Cf. Marchant v. Mead-Morrison Mfg. Co., 252 N.Y. 284, 169 N.E. 386. Whether in any particular instance it is a desirable risk is not for us to say. It is a mode of procedure fostered by statute and in the present case invoked under the agreement of the parties. If they consent to submit their rights to a tribunal with extensive powers and subject to a most restricted review, they cannot expect the courts to relieve them from the effect of their deliberate choice.

There was no repudiation of the charterparty such as was held to preclude resort to the arbitration clause in The Atlanten, 252 U.S. 313, 40 S.Ct. 332, 64 L.Ed. 586, nor was there a repudiation by way of defense going "to the substance of the whole contract" as in Jureidini v. National British and Irish Millers Insurance Co., Ltd., [1915] A.C. 499, 505.

We make no decision as to the merits of the claims. We simply hold that the arbitration agreement is broad enough to subject the various disputes we have discussed to arbitration.